IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

|  |  |
|---|---|
| | * |
| ELIZABETH WEBB, | * |
| Plaintiff, | * |
| v. | *   Civil Action No.: RDB 04-387 |
| | * |
| MARYLAND DEPARTMENT OF | |
| HEALTH AND MENTAL HYGIENE, | * |
| Defendant. | * |

\* \* \* \* \* \* \* \* \* \* \* \* \*

### MEMORANDUM OPINION

This employment discrimination action arises out of a complaint filed by Plaintiff

Elizabeth Webb ("Plaintiff") against her former employer, Maryland Department of Health and

Mental Hygiene ("DHMH" or "Defendant").[1]  Plaintiff alleges that Defendant (1) discriminated

against Plaintiff on the basis of her race and retaliated against her in violation of Title VII of the

Civil Rights Act of 1964 ("Title VII"), as amended, 42 U.S.C. § 2000e, *et. seq.*, and Md. Code

Ann. Art. 49B, and (2) denied her benefits under the Family Medical Leave Act ("FMLA"), as

amended, 29 U.S.C. §§ 2601, *et seq.*  Pending before this Court is Defendant's Motion for

Summary Judgment.  This Court has jurisdiction pursuant to 28 U.S.C. § 1331.  The parties'

submissions have been reviewed and no hearing is necessary.  *See* Local Rule 105.6 (D. Md.

2004).  For reasons stated below, Defendant's Motion for Summary Judgment is GRANTED in

part and DENIED in part as follows: GRANTED as to Count Five (Md. Code Ann. Art. 49B -

---

[1]      Plaintiff originally named in her Complaint both DHMH and Somerset County
Health Department as defendants.  However, by Letter Order dated September 13, 2006, with
consent of counsel, Somerset County Health Department was dismissed as a defendant in this
case.

Race Discrimination) and Count Six (Md. Code Ann. Art. 49B - Retaliation); DENIED as to

Count Four (Title VII - Retaliation) and Count Seven (FMLA Violations); DENIED in part as to

Count Three (Title VII - Disparate Discipline for Denial of Educational Leave); and GRANTED

in part as to Count Three (Title VII - Disparate Discipline for Missed Work and Disparate

Discharge).

BACKGROUND

Plaintiff was first employed contractually as an addiction specialist with DHMH at the

Somerset County Health Department facility in Westover, Maryland, on December 14, 2000.  At

all times, she was employed by DHMH, a state agency.  As an addiction specialist, Plaintiff

assessed welfare applicants for temporary cash assistance benefits through the Department of

Social Services.  She also monitored the applicants for disorders and referred them for substance

abuse treatment as necessary.  Plaintiff became a permanent "state merit" employee in December

of 2001.

As early as June 6, 2002, DHMH received a certificate of standing disability from Dr.

Mary Fleury, Plaintiff's treating physician, documenting that Plaintiff has Chronic Obstructive

Pulmonary Disorder ("COPD").  As a result of this documentation, a "chronic slip" was placed

in Plaintiff's personnel file, meaning that she did not have to submit medical documentation for

short absences from work related to her COPD.

Plaintiff suffered a work-related knee injury on January 4, 2002, and complications from

that injury persisted.  On November 27, 2002, Colleen Parrott, Health Officer for SCHD,

referred Plaintiff to Dr. Steven Hench, the State Medical Director, so that he could evaluate her

knee injury.  (*See* Pl.'s Mem. Opp'n Summ. J. Ex. 4.)  Dr. Hench concluded that Plaintiff needed

surgery on her knee.  Dr. Hench also noted in his follow-up workplace evaluation on March 10, 2003, that Plaintiff should stay home from work to treat a lung infection, a condition serious enough to delay the knee surgery.  (Def.'s Mem. Supp. Summ. J. Ex. 2.)  Dr. Hench saw Plaintiff again on March 17, 2003, and noted that Plaintiff was stressed because she was "angry and upset about work treatment."  (Compl. ¶ 22.)  In an apparent attempt to address Plaintiff's concerns, Dr. Hench recommended that she apply for leave under the FMLA.

On March 25, 2003, Plaintiff submitted a request for FMLA leave and included a certification of health care provider form from her personal physician, Dr. Fleury, indicating that Plaintiff's condition began on January 23, 2003, and lasted for two months.  (*See* Def.'s Mem. Supp. Summ. J. Ex. 3.)  On March 27, 2003, Plaintiff was reprimanded by Ms. Parrott for insubordination for failing to come to work.  There is confusion over how and when Plaintiff's request was granted: by memorandum dated April 2, 2003, Craig Stofko, Plaintiff's supervisor, granted Plaintiff FMLA leave beginning March 18, 2003, and on April 4, 2003, Ms. Parrott granted Plaintiff FMLA leave for the two months listed in Dr. Felury's certification.  (*See* Def.'s Reply Ex. 3.)  Regardless, Plaintiff received an additional reprimand and was suspended for five days beginning on April 2, 2003.

Plaintiff submitted another request for FMLA leave and an amended certification from Dr. Fleury on April 7, 2003.  Dr. Fleury's certification indicated that Plaintiff's symptoms began on January 23, 2003, and lasted through April 23, 2003.  However, Defendant denied Plaintiff's second application as to the period between April 1, 2003 and April 22, 2003, because Dr. Hench had certified that Plaintiff was able to work during that period.  Plaintiff was reprimanded again for failing to return to work and was suspended for ten more days to commence on April 9, 2003.

On April 23, 2003, Plaintiff was again reprimanded for failing to report to work, and she was suspended for 15 days beginning on April 30, 2003.

On September 15, 2003, Dr. Hench conducted an evaluation of Plaintiff.  He concluded that "Mrs. Webb's overall medical condition should be considered chronic in nature and it is unlikely that she will improve in the near future to the point that she can consistently and reliably perform the essential functions of the alcohol and drug associate counselor position."  (Def.'s Reply Ex. 3.)  Based upon this evaluation, DHMH notified Plaintiff that her employment would be terminated, but gave her until October 9, 2003, to obtain written documentation from another physician that she was able to come to work.  On October 3, 2003, Plaintiff was evaluated by a pulmonary specialist, Dr. Jon Beacher, who determined that her condition had improved and that she was able to return to work.  Despite Plaintiff's requests, Dr. Beacher was unable to submit the documentation by October 9th.  Plaintiff was discharged on October 22, 2003.  The notice of termination cited Dr. Hench's "medical opinion . . . that Ms. Webb cannot consistently and reliably perform the essential job functions of her position . . . [and] that this is a chronic condition and it is unlikely that she will improve in the near future."  (Def.'s Reply Ex. 2.)

Plaintiff had filed a complaint with the Equal Employment Opportunity Commission ("EEOC") and Maryland Commission on Human Relations on April 11, 2003.  (*See* Def.'s Reply Ex. 3.)  The agency made no formal findings on the merits of Plaintiff's case, and issued a right to sue letter dated November 10, 2003.  (*See* Pl.'s Mem. Opp'n Mot. Dismiss Ex. A.)  Plaintiff brought this action on February 12, 2004.  On May 25, 2004, Defendants filed a Motion to Dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim and in the alternative for Summary Judgment (Paper No. 4).  This Court granted in part and denied in

4

part Defendant's motion, dismissing Counts I and II of Plaintiff's seven-count Complaint on

January 6, 2005 (Paper No. 10).  The remainder of the Complaint sets forth the following causes

of action: Count Three avers disparate discipline and termination based upon Plaintiff's race in

violation of Title VII; Count Four claims retaliation for Plaintiff's filing of a protest of the

alleged race discrimination with the EEOC in violation of Title VII; Count Five alleges race

discrimination in discipline and termination under Maryland Code Annotated, Art. 49B §

16(a)(1); Count Six alleges retaliation for Plaintiff's race discrimination complaints, in violation

of MD Code, Art. 49B, § 16(f); and Count Seven asserts that Defendant unlawfully interfered

with Plaintiff's rights under the FMLA.  On October 28, 2005, Defendant filed a Motion for

Summary Judgment (Paper No. 22).

<u>STANDARD OF REVIEW</u>

Summary judgment is appropriate under Rule 56(c) of the Federal Rules of Civil

Procedure when there is no genuine issue as to any material fact, and the moving party is plainly

entitled to judgment in its favor as a matter of law.  In *Anderson v. Liberty Lobby, Inc.*, the

Supreme Court explained that, in considering a motion for summary judgment, "the judge's

function is not himself to weigh the evidence and determine the truth of the matter but to

determine whether there is a genuine issue for trial."  477 U.S. 242, 249 (1986).  A dispute about

a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for

the nonmoving party."  *Id.* at 248.  Thus, "the judge must ask himself not whether he thinks the

evidence unmistakably favors one side or the other but whether a fair-minded jury could return a

verdict for the [nonmoving party] on the evidence presented."  *Id.* at 252.

In undertaking this inquiry, a court must view the facts and the reasonable inferences

drawn therefrom "in the light most favorable to the party opposing the motion," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting *United States v. Diebold*, Inc., 369 U.S. 654, 655 (1962)); *see also E.E.O.C. v. Navy Federal Credit Union*, 424 F.3d 397, 405 (4th Cir. 2005).  However, the opponent must bring forth evidence upon which a reasonable fact finder could rely.  *Celotex Corp. v. Catrett,* 477 U.S. 317 (1986).  "Once the movant has established the absence of any genuine issue of material fact, the opposing party has an obligation to present some type of evidence to the court demonstrating the existence of an issue of fact."  *Pension Ben. Guar. Corp. v. Beverley*, 404 F.3d 243, 246-47 (4th Cir. 2005) (citing *Pine Ridge Coal Co. v. Local 8377, UMW,* 187 F.3d 415, 422 (4th Cir. 1999)).  Rule 56(e) also requires that "affidavits submitted by the party defending against a summary-judgment motion contain specific facts, admissible in evidence, from an affiant competent to testify, 'showing that there is a genuine issue for trial.'"  *Id.* (quoting 10B Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2740, 399 (3d ed. 1998)).  The mere existence of a "scintilla" of evidence in support of the nonmoving party's case is not sufficient to preclude an order granting summary judgment.  *Anderson*, 477 U.S. at 252.

This Court has previously held that a "party cannot create a genuine dispute of material fact through mere speculation or compilation of inferences."  *Shin v. Shalala,* 166 F. Supp. 2d 373, 375 (D. Md.  2001) (citations omitted).  Indeed, this Court has an affirmative obligation to prevent factually unsupported claims and defenses from going to trial.  *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993) (quoting *Felty v. Graves-Humphreys Co.*, 818 F.2d 1126, 1128 (4th Cir. 1987)).

<u>DISCUSSION</u>

I.      **Count Three: Title VII Race Discrimination**

Count Three purports to state a claim under Title VII of the Civil Rights Act of 1964

("Title VII"), as amended, 42 U.S.C. § 2000e, *et. seq.*  Specifically, Plaintiff alleges that

Defendant discriminated against her on the basis of her race, because she was "subjected to

disparate discipline and was ultimately terminated."  (Compl. ¶ 100.)

Plaintiff has not produced any direct evidence of employment discrimination.  Thus, in

order to establish a claim for employment discrimination based on race, she must satisfy the

three-step burden-shifting test first articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S.

792 (1973).  First, a plaintiff must present enough evidence to prove a *prima facie* case of

discrimination.  *Reeves v. Sanderson Plumbing Products*, 530 U.S. 133, 142-43 (2000).  Second,

once the plaintiff establishes a *prima facie* case, the burden shifts to the defendant to produce

evidence that the adverse employment action was taken against the plaintiff "for a legitimate,

nondiscriminatory reason."  *Id.* at 142 (citing *Tex. Dept. Cmty. Affairs v. Burdine*, 450 U.S. 248,

254 (1981)).  Third, the plaintiff is "afforded the 'opportunity to prove by a preponderance of

evidence that the legitimate reasons offered by the defendant were not its true reasons, but were

a pretext for discrimination.'"  *Id.* (quoting *Burdine*, 450 U.S. at 253).  Because Plaintiff has

alleged that she was subjected to disparate treatment in the form of both disparate discipline and

discriminatory discharge, the two claims will be discussed separately.

A.      **Disparate Discipline**

1.      **Denial of Educational Leave: *Prima Facie* Case**

The Fourth Circuit has held that,

7

> [i]n the context of a discipline case, the familiar elements of a *prima facie* showing are that (1) plaintiff belongs to a protected class; (2) plaintiff "engaged in prohibited conduct similar to that of a person of another race;" and (3) "that disciplinary measures enforced against the plaintiff were more severe than those enforced against the other person."

*Shields v. Fed. Express Corp.*, 120 Fed. Appx. 956, 964 (4th Cir. 2005) (citing *Moore v. City of Charlotte*, 754 F.2d 1100, 1105-06 (4th Cir. 1985)).  The first element is not in dispute.

On April 5, 2002, Plaintiff and a Caucasian co-worker, Samantha Miles, got into a verbal altercation at work after another employee told Ms. Miles that Plaintiff had sat at and left food on her desk.  (Def.'s Mem. Supp. Summ. J. 16.)  Both women engaged in similar "prohibited conduct" by arguing with each other and allegedly using profanities while clients were "out in the front waiting to be seen."  (Webb Dep. 152:10-11, Aug. 9, 2005.)  Thus, the second element of the *prima facie* case has been met.

The third element is in dispute.  Plaintiff alleges that, after this incident, Defendant disciplined her differently than Ms. Miles, who is not a member of a protected class under Title VII.  Plaintiff concedes that both Plaintiff and Ms. Miles received the same one-day suspension for unprofessional conduct.  (Webb Dep. 151:14-152:14, Aug. 9, 2005.)  However, Plaintiff contends that she was further disciplined when she was told by both Colleen Parrott and Sandra Leatherbury that she could not receive educational leave time and tuition assistance to pursue a master's degree because of the disciplinary action on her record resulting from the incident.[2]

---

[2]    In her complaint, Plaintiff claims that she was "subjected to disparate discipline and was ultimately terminated."  (Compl. ¶ 100.)  Plaintiff produces evidence of "disparate treatment" in her Memorandum in Opposition to Defendant's Motion for Summary Judgment, including the statements made by Ms. Parrott and Ms. Leatherbury as to educational leave. (Pl.'s Mem. Opp'n Summ. J. 16-18.)  Although Plaintiff does not expressly label these conversations as "discipline," she cites case law describing a *prima facie* case for disparate

(Webb Dep. 171:9-172:11, Aug. 9, 2005.)  Both Ms. Parrott and Ms. Leatherbury deny making such statements to Plaintiff.  (*See* Parrott Dep. 61:1-5, Nov. 4, 2005; Leatherbury Dep. 70:12-71:5, Aug. 10, 2005.)  At the time of the incident, Ms. Miles was using educational leave to pursue a master's degree in social work, and she was allowed to continue using educational leave after the incident.  (*See* Parrott Dep. 59:13-16, Nov. 4, 2005; Leatherbury Dep. 70:5-11, Aug. 10, 2005.)  Because Plaintiff was told she could not receive educational leave to pursue a master's degree  but Ms. Miles could continue to take educational leave to pursue a master's degree, Plaintiff alleges she was more severely punished than her Caucasian co-worker who was involved in the same incident.  This Court finds that Plaintiff has produced a *prima facie* case of disparate discipline, and will examine the evidence produced by Defendant of a legitimate, non-discriminatory reason for the disparate treatment.

### 2.    Denial of Educational Leave: Legitimate, Nondiscriminatory Reason

---

discipline, so this Court assumes she meant to categorize the statements as discipline.  The Fourth Circuit has recognized a *prima facie* case for discriminatory denial of training.  *See Thompson v. Elec. Power Co.*, 312 F.3d 645, 649-50 (4th Cir. 2002) (citing *Pafford v. Herman*, 148 F.3d 658, 667 (7th Cir. 1998)).  However, Plaintiff did not plead this in Count Three of her complaint, so this Court need not address that variation of the disparate treatment claim.

Plaintiff also alleges that a Caucasian co-worker, Craig Stofko, received a promotion to "state merit employee" before she did, even though they were both initially hired as contractual employees and he was hired after her.  (Pl.'s Mem. Opp'n Summ. J. 17-18.)  However, this kind of employment action does not qualify as either disparate discipline or discharge, the two forms of adverse employment actions Plaintiff alleged she suffered in her Complaint.  (*See* Compl. ¶ 100.)  Even if this Court were to construe the allegations in paragraph 100 of her Complaint liberally, Plaintiff did not produce sufficient evidence to indicate that Mr. Stofko was a similarly situated employee, because he and Plaintiff had different job titles and responsibilities.  (*See, e.g.,* Stofko Dep. 27:3-28:15, Aug. 8, 2005.)

Finally, Plaintiff raises for the first time in her Response allegations of a hostile work environment.  (Pl.'s Mem. Opp'n Summ. J. 2, 5-6.)  This claim similarly was not presented in Plaintiff's complaint, so this Court need not address it.

Although it denies that Ms. Parrott or Ms. Leatherbury ever told Plaintiff that she could not receive educational time, Defendant contends that, even if such a conversation took place, race was not a motivating factor.  (Def.'s Reply 4.)  Defendant points to the fact that three of Plaintiff's African American co-workers were also pursuing master's degrees at the same time as Ms. Miles as evidence of a non-discriminatory reason for the alleged disciplinary action. (Parrott Dep. 57:14-58:11, Nov. 4, 2005.)  Also, Defendant contends that there is no evidence that Ms. Miles used educational leave to miss work to pursue her master's degree after the incident. (Def.'s Reply 4.)  Finally, Defendant points out the absence of evidence that Plaintiff applied for an eligible master's program or formally requested educational leave time and tuition assistance from Defendant.  (*Id*.)

This Court finds that Defendant has failed to meet its burden of articulating a legitimate, non-discriminatory reason for telling Plaintiff she could not receive the same educational leave time as Ms. Miles as a result of the disciplinary entry on her record from the incident.  The three other African-American employees receiving educational leave to pursue master's degrees were not involved in the incident at issue, so Defendant cannot possibly argue that those three women and Ms. Miles were similarly "disciplined."  If, in fact, Ms. Miles did not receive educational leave or tuition assistance to pursue a master's degree after the incident, then she certainly could not have been disciplined by having the right to pursue a degree on her own time taken away. However, viewing the facts in a light most favorable to Plaintiff, and in the absence of evidence to the contrary, this Court must assume that Ms. Miles continued to receive four hours a week of educational leave after the incident.  In addition, assuming the alleged conversations with Ms. Parrott and Ms. Leatherbury took place, it is understandable that Plaintiff did not formally

request educational leave.

Viewing the facts in a light most favorable to Plaintiff as the nonmoving party, this Court finds that there is a genuine issue of material fact as to whether Plaintiff was disciplined more severely than Ms. Miles with respect to educational leave.

### 3.       Discipline for Missed Work: *Prima Facie* Case

Plaintiff also claims that she was more harshly disciplined than co-workers for her absences from work due to her medical conditions.  Specifically, she argues that she was required to produce medical documentation for each day of work missed due to her chronic health condition, COPD, despite the presence of a chronic slip in her file, which is supposed to relieve an employee of that obligation.  (Pl.'s Mem. Opp'n Summ. J. 18-19.)  However, Plaintiff has not met the second or third elements of a *prima facie* case for disparate discipline.

First, Plaintiff has not produced sufficient evidence to meet the second element under *Shields* that she "engaged in prohibited conduct similar to that of a person of another race."  For one thing, it is not clear what conduct Plaintiff and her allegedly similar co-workers engaged in that was "prohibited."  Although there is evidence that there were other employees with very few leave hours remaining and evidence that there were other employees with chronic slips in Defendant's files (*see* Leatherbury Dep. 51:7-19, 52:4-15, Aug. 10, 2005), Plaintiff has not identified any co-workers who (1) had little leave time, (2) had a chronic slip, and (3) engaged in the same "prohibited conduct" as her.  Finally, Plaintiff has not identified any co-workers meeting those criteria who were not a member of a protected class.[3]

---

[3]       Plaintiff cites a page of the deposition of Ms. Leatherbury in support of her arguments relating to the sick slips but failed to include that page in her Response, and the page was not a part of Defendant's pleadings.  Even if Plaintiff had included this page, however, it

In addition, Plaintiff has failed to show that she was disciplined more severely than other employees.  As Defendant notes, Plaintiff was subjected to the same schedule of progressive discipline applicable to all of Defendant's employees who miss work without proper justification.  (Def.'s Mem. Supp. Summ. J. 17.)  Plaintiff also has not produced evidence specifically showing that she was required to submit sick slips for each missed day while other employees were not required to do so.[4]  Thus, this Court finds that Plaintiff has failed to produce evidence of a *prima facie* case of disparate discipline when Plaintiff was required to produce documentation from a doctor for days she missed due to her COPD.

### 4.    Discipline for Missed Work: Legitimate, Nondiscriminatory Reason

Even if Plaintiff could provide a *prima facie* case, Defendant has offered a legitimate, non-discriminatory reason for requiring Plaintiff to submit documentation of her absences.  The specific reason why Ms. Parrott initiated disciplinary action against Plaintiff for failing to return to work in March of 2003 was that the State Medical Director, Dr. Hench, had found Plaintiff was healthy enough to come in to work.  (Parrott Dep. 103:13-104:3, Nov. 4, 2005; Leatherbury Dep. 117:6-10, Aug. 10, 2005.)  Any requirements to submit sick slips also likely stemmed from that belief.  Defendant produced evidence that Ms. Parrott believed at the time that the opinion of Dr. Hench trumped that of Plaintiff's own physician, Dr. Fleury, who advised her to stay home. (Parrott Dep. 104:4-106:7, Nov. 4, 2005.)  Even though Ms. Parrott admitted that she later found out that a third-party doctor's note carries weight, and thus she was mistaken in her earlier

---

would not have affected this Court's decision on this matter; there is simply no evidence that Plaintiff was "disciplined" more severely than non-protected co-workers for engaging in a prohibited activity.

[4]        *See supra* note 2.

understanding, Defendant has satisfied its burden of articulating a non-discriminatory reason for the disciplinary action taken against Plaintiff.

In shifting the burden back to Plaintiff, this Court finds that Plaintiff has produced no evidence that Defendant's proffered reason was a pretext for intentional discrimination.  There is no evidence that Ms. Parrott acted for any reason other than her mistaken belief that Plaintiff was healthy enough to return to work or that she relied on Dr. Hench's opinion out of prejudice.  Thus, this Court finds that there is no genuine issue of material fact as to whether Plaintiff was disparately disciplined for failing to come to work.

**B.      Discharge**

**1.      *Prima Facie* Case**

Plaintiff claims that she was fired based on her race.[5]  (Compl.  ¶ 100.)  Plaintiff may establish a *prima facie* case of discriminatory discharge "by showing that (1) [s]he is a member of a protected class, (2) [s]he suffered an adverse employment action (such as discharge), (3) [s]he was performing [her] job duties at a level that met the employer's legitimate expectations at the time of the adverse employment action, and (4) [her] position remained open or was filled by a similarly qualified applicant outside the protected class." *Baqir v. Principi*, 434 F.3d 733, 742 (4th Cir. 2006) (citing *Hill v. Lockheed Martin Logistics Mgmt., Inc*., 354 F.3d 277, 285 (4th Cir. 2004) (en banc)).  The first two elements of the *prima facie* case are easily met because there is

---

[5]      Plaintiff filed her charge of discrimination with the EEOC in April of 2003, but she was not fired until October of that year.  As a result, because she did not mention the discharge in her EEOC report, she arguably failed to exhaust her administrative remedies with respect to that specific employment action.  However, for the reasons stated below, this Court need not address that issue because her claim lacks sufficient evidentiary support to survive summary judgment.

no dispute that Plaintiff is a member of a protected class or that she was discharged.  *See Hartsell  v. Duplex Products, Inc.,* 123 F.3d 766, 775 (4th Cir. 1997) (recognizing that discharge is an adverse employment action).

In order to satisfy the third element, Plaintiff would need to show that her job performance was meeting her employer's expectations at the time of her discharge.  Plaintiff has introduced evidence that her supervisors were pleased with her work as a whole.  (See Pl.'s Mem. Opp'n Summ. J. Ex. 2-3.)  Even though neither of the documents she produced were dated near the time of her discharge, there is no evidence that Plaintiff's supervisors were ever subsequently displeased with Plaintiff's actual job performance when she was present.  In viewing the facts most favorably to Plaintiff, this Court finds that Plaintiff has satisfied the third element.

The fourth element requires a showing that Plaintiff's position remained open or was filled by someone outside the protected class.  In *Miles v. Dell*, the Fourth Circuit held that

> a plaintiff must ordinarily show that she was replaced by someone outside her protected class because, when someone within her protected class is hired as a replacement, that fact ordinarily gives rise to an inference that the defendant did not fire the plaintiff because of her protected status. . . . In other words, replacement within the protected class gives rise to an inference of non-discrimination with respect to the protected status.  The fourth prong requires plaintiffs, as part of their *prima facie* case, to eliminate this inference of non-discrimination.

429 F.3d 480, 488 (4th Cir. 2005).  However, the Fourth Circuit also noted that in certain circumstances, replacement by someone within the protected class does not automatically give rise to an inference of non-discrimination.  *Id.*  Specifically, the court pointed to two categories of exceptions: 1) where the employer hired someone else in the protected class in order to

"disguise" its discriminatory discharge of the plaintiff, and 2) where the firing decision and hiring decision were made by two different people. *Id.* at 488-89.

In this case, Plaintiff was replaced by an African-American woman, Diane Washington-White, and when Ms. White left, her position was filled by another African-American woman, Julie Cotton. (Parrott Dep. 193:14-20, 196:22-197:7, Nov. 4, 2005.) The fact that Plaintiff was replaced by members of her protected class gives rise to an inference of non-discrimination. There is no evidence that Defendant hired Ms. Washington-White in order to "disguise" that it fired Plaintiff because of her race or that different people fired Plaintiff and hired Ms. Washington-White -- Ms. Parrott apparently signed off on both decisions. (Def.'s Reply Ex. 2; Parrott Dep. 193:14-194:16.) Thus, there is no evidence to rebut the inference of non-discrimination. Because the fourth element is not met, Plaintiff has not been able to establish a *prima facie* case of discriminatory discharge.

## 2.      Legitimate, Nondiscriminatory Reason

Even if Plaintiffs had met a *prima facie* case of discriminatory discharge, Defendant has introduced evidence that Plaintiff was fired as a result of the September 16, 2003, opinion of Dr. Hench, the State Medical Director, that Plaintiff was unable to perform her necessary job functions. (Def.'s Reply Ex. 3.) In support of its contention, Defendant notes that it previously complied with Dr. Hench's opinion that Plaintiff should *not* go to work. (Def.'s Mem. Supp. Summ. J. 18.) Thus, "[a]t all times" Defendant arguably followed Dr. Hench's recommendations. (*Id.*) This Court finds that following the medical opinion of the State Medical Director that Plaintiff was unable to perform her necessary job functions is a legitimate, nondiscriminatory reason for firing Plaintiff.

In response, Plaintiff has failed to show by a preponderance of the evidence that her

supervisors' reliance on Dr. Hench's opinion was a pretext for intentional discrimination.  She

provides ample arguments that Dr. Hench's analysis was flawed.[6]  (Pl.'s Mem. Opp'n Summ. J.

20-22.)  However, even if this Court assumes that Dr. Hench's evaluation was flawed, Plaintiff

has not sufficiently demonstrated that her supervisors were aware of any discrepancies and

intentionally ignored them as a pretext for discrimination in order to fire her.  On the contrary,

Plaintiff was given time to produce her own doctor's report saying that she could return to work,

but Defendant did not receive any such report by the deadline.[7]  Thus, there is no genuine issue

of material fact as to whether Plaintiff was subjected to discriminatory discharge, and Defendant

is entitled to judgment as a matter of law.

For the reasons stated above, Count Three of Defendant's Motion for Summary Judgment

is GRANTED in part and DENIED in part as follows: Defendant's Motion is GRANTED as to

---

[6]     Dr. Hench admitted in his deposition that there was a typographical error in one of the reports he relied on in making his evaluation of Plaintiff.  (Hench Dep. 95:5-96:10, Aug. 12, 2005.)  Specifically, the report of Dr. William Nagel, a pulmonary specialist, stated that he had examined Plaintiff in 1999, when in fact it was 2003.  (*Id*.)  However, he said this error did not affect his ultimate conclusion that Plaintiff could not perform her job functions.  (*Id*.)

[7]     Plaintiff did timely request that Dr. Beacher send Defendant a letter saying she was able to work, but for reasons beyond her control, Dr. Beacher's office misplaced Plaintiff's file and did not submit the evaluation in time.  Dr. Beacher wrote a letter taking full responsibility for the missed deadline, but Plaintiff had already been fired by the time Defendant received the letter.  However, in his deposition, Dr. Beacher also stated that the letter he sent Defendant only pronounced Plaintiff able to go to work on October 14, 2003; he could not make any predictions about her ability to perform her duties beyond October 14, because her symptoms varied so greatly from day to day.  (Beacher Dep. 47:16-49:17, Sept. 21, 2005.)  This Court sympathizes with Plaintiff for the unfortunate chronology of events, but there is still no evidence that Defendant was aware that a misplaced file prevented Dr. Beacher from sending in his letter until well after the deadline passed, or that it even would have contradicted Dr. Hench's opinion about Plaintiff's long-term capabilities.

Plaintiff's claims for disparate discipline for missed work and disparate discharge, and DENIED

as to her claim for disparate discipline for denial of educational leave.

## II        Count Four: Title VII Retaliation

Count Four also purports to state a claim under Title VII.  Specifically, Plaintiff alleges

that Defendant violated the provision that it is unlawful for "an employer to discriminate against

any of his employees . . . because he has opposed any practice made an unlawful employment

practice . . . or because he has made a charge, testified, assisted, or participated in any manner in

an investigation, proceeding, or hearing" involving Title VII violations.  42 U.S.C. § 2000e-2.

The *McDonnell Douglas* burden-shifting analysis discussed *supra* in Part I, applies to

retaliation claims as well.  To establish a *prima facie* case of retaliation, the employee must show

(1) that she engaged in a protected activity, (2) that her employer took an employment action

against her that a reasonable employee would have found materially adverse, and (3) that there

was a causal connection between the protected activity and the adverse employment action.  *Hill*,

354 F.3d at 298; *Burlington Northern & Ry. Co. v. White*, 126 S. Ct. 2405, 2415 (2006).[8]

### A.     *Prima Facie* Case

Plaintiff engaged in a protected activity when she "complained about discrimination in a

group grievance among African American SCHD employees and cross-filed a Charge of

Discrimination" with the EEOC and Maryland Commission on Human Relations in April 2003.[9]

---

[8]        Because the parties submitted briefing before the *Burlington* case was decided,
they did not discuss the implications of the Supreme Court's modification of the second prong of
the test to include the requirement that a *reasonable* employee find the employment action
*materially adverse*.

[9]        Plaintiff's complaint actually alleges that she "cross-filed" the EEOC charge in
June 2003, but the form she filled out is dated April 11, 2003.  (Def.'s Reply Ex. 3.)  Defendant

(Compl. ¶ 107.)  Plaintiff has clearly met the first prong of the test for retaliation.

With respect to the second prong, Plaintiff alleges that, in response to these actions, "Defendant engaged in a pattern of harassing conduct toward Plaintiff relating to Plaintiff's need for workplace accommodations and medical leave of absence. . . ." and ultimately fired her.  (*Id.* ¶ 108-09.)  First, she claims Ms. Parrott forced her to undergo a workability evaluation.  Second, she was placed on a one-day sick slip requirement despite the presence of a chronic slip in her file.  Third, she claims that her request to seek donations of leave time from co-workers was inappropriately denied.   Finally, she was fired, which is clearly an adverse employment action. Each of the first three actions will be discussed separately.

First, on November 27, 2002, Ms. Parrott referred Plaintiff to the State Medical Examiner for an evaluation.  (*See* Pl.'s Mem. Opp'n Summ. J. Ex. 4.)  Plaintiff alleges that this was an adverse employment action taken against her in retaliation for her participation in a group grievance filed with the EEOC in October of 2002.   Under *Burlington*, an employment action must be materially adverse to a reasonable employee in order to satisfy the second prong of the *prima facie* case for retaliation.  126 S. Ct. at 2415.  The policy behind this requirement is to prevent employment actions that could "dissuade[] a reasonable worker from making or supporting a charge of discrimination."  *Id.* (citation omitted).  A reasonable employee contemplating bringing a discrimination charge would not likely be deterred simply because she was referred for a medical exam.  In addition, the context in which this particular referral was made renders it even less objectionable.  Specifically, Plaintiff injured her knee in January of 2002 and had applied for Workers Compensation benefits.  The letter from Ms. Parrott to Brenda

---

received notice from the EEOC of Plaintiff's charge on June 20, 2003.

Scott, a personnel officer, "requesting that [Plaintiff] be referred to the States [sic] Medical

Examiner" says that the referral is "[i]n reference to [Plaintiff's] previous Workers

Compensation claim for her knee injury."[10]  (Pl.'s Mem. Opp'n Summ. J. Ex. 4.)  Plaintiff even

acknowledges in her Memorandum in Opposition to Defendant's Motion for Summary Judgment

that the referral was for her knee injury and PTSD.  (*Id.* at 24.)  In addition, a reasonable

employee seeking workers compensation could hardly object to a medical evaluation of her

injury.  Thus, this Court finds the referral for a workability evaluation does not qualify as an

adverse employment action.

Second, Plaintiff was placed on the one-day sick slip requirement on June 26, 2003,

despite the chronic sick leave slip in her file.  A reasonable employee with a chronic condition

causing her to miss many days of work would most likely find it extremely inconvenient to have

to obtain a doctor's note for each day missed.  Given the prospect of making many trips or calls

to the doctor, this sort of action could deter an employee from making a discrimination charge

against her employer.  Thus, this Court finds that the one-day sick slip order satisfies the second

prong.

Third, Plaintiff was denied the right to accept donations of leave time from her co-

workers on June 26, 2003.  Under Maryland regulations, state employees can donate their leave

time to other employees who have exhausted theirs.  *See* COMAR 17.04.11.22 (2006).

Assuming that Plaintiff was eligible to receive leave, denial of that right would certainly be an

---

[10]     The letter also mentions that Plaintiff had been absent from work because of Post-
Traumatic Stress Disorder ("PTSD"), and Ms. Parrott wanted that checked out by Dr. Hench as
well.  (Pl.'s Mem. Opp'n Summ. J. Ex. 4.)  Even if this is more objectionable than a workers
compensation claim referral, it still does not rise to the level of material adversity for a
reasonable employee.

adverse employment action.  In sum, Plaintiff has satisfied the second prong with respect to

being placed on the one-day sick slip requirement, being denied the ability to accept leave

donations, and being fired.

As to the third prong, both this Court and the Fourth Circuit have held that proximity in

time between the protected activity and the employment action is sufficient to establish the

causation requirement.  *See Causey v. Balog*, 162 F.3d 795, 803 (4th Cir. 1998) (finding the

thirteen-month interval between the plaintiff's charge of discrimination and termination was "too

long to establish causation absent other evidence of retaliation"); *Dowe v. Total Action Against

Poverty in Roanoke Valley*, 145 F.3d 653, 657 (4th Cir. 1997) ("A lengthy time lapse between

the employer becoming aware of the protected activity and the alleged adverse employment

action

. . .  negates any inference that a causal connection exists between the two."); *Elries v. Denny's,

Inc.*, 179 F. Supp. 2d 590, 599 (D. Md. 2002).  Plaintiff first alleges a connection between the

group grievance she joined in October of 2002 and the subsequent referral to Dr. Hench in

November of 2003.  However, because this Court does not find the workability evaluation

referral to rise to the level of an adverse employment action, there is no need to establish a causal

connection between the two.  Plaintiff also alleges that her filing of a complaint with the EEOC

on April 11, 2003, was connected to both her placement on one-day sick slip leave on June 26,

2003, and her denial of right to accept leave donations on July 28, 2003.  The temporal proximity

"clock" starts ticking when the employer learns of the employee's charge of discrimination.  *See

Dowe*, 145 F.3d at 657.  In this case, Defendant learned of the charge on June 20, 2003.  The

closeness in time of the sick slip order and denial of right to accept leave donations -- six days

and just over one month, respectively -- is sufficient to establish the causation requirement in satisfaction of the third prong of the *prima facie* case.

Plaintiff's discharge on October 22, 2003 took place approximately four months after Defendant was notified about her individual EEOC charge and a year after her group grievance. Neither time frame automatically satisfies the causation requirement.  However, if Plaintiff could establish a pattern of adverse employment actions following her individual EEOC charge, a reasonable jury could find that her discharge was causally connected to a protected activity. Thus, Plaintiff has established a *prima facie* case for retaliation.

### B.    Legitimate, Nondiscriminatory Reason

Defendant claims in general that none of the allegedly adverse employment actions were taken in retaliation to Plaintiff's engagement in protected activities.[11]  However, Defendant did not introduce evidence of any legitimate reasons for the first two actions taken against Plaintiff: the one-day sick slip order and the denial of her right to accept leave donations.  Defendant has introduced evidence that the decision to fire Plaintiff was based on the medical evaluation of Dr. Hench that Plaintiff was not able to perform her job responsibilities in light of her respiratory condition.  (*See supra* Part I.B.2.)  As discussed above, this Court finds that to be a legitimate, nondiscriminatory basis for firing Plaintiff.

On shifting the burden back to Plaintiff to present evidence that this legitimate reason is pretext for retaliation and not discrimination, however, the result is different.  In *Elries*, this Court denied summary judgment where six months passed between the plaintiff's charge of

---

[11]Defendant did not respond to Plaintiff's arguments on the retaliation claim in its Reply. (*See* Def.'s Reply.)

discrimination and his actual termination, because there was evidence that "retaliatory conduct

. . . began shortly after filing a complaint . . . even though actual termination came much later."

179 F. Supp. 2d at 599.  Additionally, in *Causey*, the Fourth Circuit said that where proximity is

insufficient, the plaintiff can introduce other evidence of retaliation. Viewing the facts in a light

most favorable to Plaintiff as the nonmoving party, Plaintiff has presented evidence that her

termination was the culmination of a pattern of conduct in retaliation for her EEOC charge.

Thus, she has met her burden of introducing enough evidence that a reasonable jury could find

that the reliance on Dr. Hench's medical opinion was a pretext for retaliation.

      For the reasons stated above, Defendant's Motion for Summary Judgment is DENIED as

to Count Four, and Plaintiff may proceed with her claim for retaliation.

## III.    Counts Five and Six (Md. Code Ann. Art. 49B)

      Counts Five and Six purport to state claims under Article 49B of the Maryland Annotated

Code.  As noted by this Court previously, the employment discrimination provisions of Article

49B "empower only the Maryland Human Rights Commission to initiate litigation upon an

employer's refusal to comply with the Commission's orders. . . . The statute does not create a

private cause of action."  *Jordan v. CSX Intermodal, Inc.,* 991 F. Supp. 754, 756 n.1 (D.

Md.1998) (citations omitted) (emphasis added).  *See Parlato v. Abbott Laboratories,* 850 F.2d

203, 205 (4th Cir. 1988); *Malina v. Baltimore Gas and Elec. Co.*, 18 F. Supp. 2d 596, 611 (D.

Md. 1998) (citing *Jordan,* 991 F. Supp. at 756 n.1); *Dillon v. Great Atlantic & Pacific Tea Co.,*

403 A.2d 406, 409 (Md. Ct. Spec. App. 1979).  Discovery having been had on the Maryland

claims, this Court finds that there are no genuine issues of material fact that would enable

Plaintiff to obtain relief under Md. Code Ann. Art. 49B, and Defendant is entitled to judgment as

a matter of law.  Accordingly, Defendant's Motion for Summary Judgment is GRANTED as to Counts Five and Six.

## IV.    Count Seven (FMLA)

Count Seven purports to state a claim under the Family Medical Leave Act of 1993 ("FMLA" or "Act"), as amended, 29 U.S.C. §§ 2601, et seq.  Under the FMLA, "[i]t shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under [the FMLA]."  *Id*. § 2615.  One such right is to "12 workweeks of leave during any 12-month period for . . . a serious health condition that makes the employee unable to perform the functions of the position of such employee."  *Id*. § 2612(a)(1)(D).  An employer may demand certification by the employee's health care provider documenting the employee's health condition.  *Id*. § 2613(a).  Upon returning from FMLA leave, an employee is entitled to be "restored" to her previous position (or an equivalent one), and any benefits that accrued before she took leave.  *Id*. § 2614(a)(1)-(2).  Section 2617 provides a private right of action for employees to recover monetary damages and obtain equitable relief for their employers' violations of the Act.

In her complaint, Plaintiff alleges that Defendant violated the FMLA because, after she requested leave for her serious health condition, COPD, Defendant (1) "improperly required Plaintiff to exhaust leave under the FMLA unrelated to her serious health condition . . ."; (2) "denied Plaintiff's second request for leave under the FMLA"; and (3) "failed to maintain the status quo with respect to Plaintiff's job and benefits while on leave pursuant to the FMLA." (Compl. ¶¶ 135-37.)  Defendant argues that it did not violate the FLMA for any of those reasons,

and, even if it did, that Plaintiff is judicially estopped from bringing an action under the FMLA

because she receives Social Security Disability Insurance ("SSDI") benefits.[12]

A.      **Alleged Violations of the FMLA**

First, Plaintiff claims that Defendant violated the FMLA by applying FMLA leave to

time she was absent from work for non-COPD health reasons.  Plaintiff first requested a month

of FMLA leave at SCHD on November 20, 2002, pursuant to the certification of Dr. Bulette.

(Webb Dep. 140:1-18, Aug. 9, 2005.)  However, Plaintiff could not remember if that leave was

granted or denied, and neither party has introduced any documentation from this request.  (*Id.* at

140:19-20.)  Without evidence that this FMLA leave request was granted or not, Plaintiff cannot

claim that Defendant improperly exhausted any of her FMLA leave at that time.

On March 25, 2003, Plaintiff again requested FMLA leave, although neither party

apparently has Plaintiff's actual request form.[13]  In a memorandum dated April 2, 2003, Craig

Stofko, Plaintiff's supervisor, granted Plaintiff's "March 19, 2003" request for FMLA leave

"beginning on March 18, 2003," where the end date was left blank.  (Def.'s Reply Ex. 3.)  There

are two problems with this memorandum.  For one thing, it implies that Plaintiff submitted her

FMLA request on March 19th, but Dr. Fleury's certification for that request was dated March

25th.  (*Id.*)  More importantly, listing March 18th as the start date for the leave is entirely

---

[12]      Defendant also advances the argument that Plaintiff cannot recover because she
has not suffered any applicable damages under the FMLA.  (Def.'s Reply 12.)  Defendant is
correct that the FMLA allows recovery only of actual damages, such as lost wages and benefits.
However, a reasonable jury could find that Plaintiff has suffered monetary damages resulting
from her alleged loss of FMLA leave.

[13]      Plaintiff notes that her actual FMLA request from March was missing from her
personnel file.  (Pl.'s Mem. Opp. Summ. J. 25-26; Scott Dep. 82:14-83:8.)  The exact date of her
request is also unclear; she claims that she made the request "on or about March 25".

contradictory to a memorandum dated April 4, 2003, that informs Plaintiff that she was granted FMLA leave for the period from January 23, 2003, through March 23, 2003.  (*Id*.)  Defendant correctly notes that the FMLA certification letter from Dr. Fleury lists January 23, 2003, as the date on which Plaintiff's "condition commenced" and that she was supposed to remain home from work for "2 months."  (*Id*.)  Assuming that Plaintiff requested leave beginning on March 18, 2003, at the very least, her supervisors should have noticed a discrepancy in the dates between Plaintiff's request form and her supporting doctor's certification and sought clarification.  Also, Plaintiff notes that she was not absent from work for most of those two months, although it is unclear how much FMLA leave was actually deducted given the conflicting memoranda.  Accordingly, there is a genuine issue of material fact as to whether Defendant inappropriately applied FMLA leave that Plaintiff did not request and therefore interfered with Plaintiff's rights under the Act.

Plaintiff also alleges that her second request for FMLA leave was denied.  (Compl. ¶ 136.)  It is unclear to this Court which FMLA request the complaint meant as the "second."  As mentioned previously, Plaintiff does not recall if her November, 2002, request was granted or denied, and her March, 2003, request was granted (albeit possibly for the wrong dates).  Plaintiff made a third request on April 7, 2003, to take off work through April 23, 2003.  (Fleury Dep. 15:17-16:7, Sept. 30, 2005.)  Defendant claims that this request was denied because Plaintiff had exhausted her twelve weeks allowed under the Act.  (Def.'s Mem. Supp. Summ. J. 24.)  Assuming that the FMLA leave for the period of January 23, 2003, through March 23, 2003, counted towards the twelve weeks, then there is a genuine issue of material fact as to whether Plaintiff was inappropriately denied FMLA leave in April of 2003.

Finally, Plaintiff alleges that when she returne

d from FMLA leave, her position and benefits were not restored to her which would violate section 2614(a)(1)-(2) of the Act.  It is unclear on which date(s) Plaintiff exactly returned from FMLA leave, given the confusion as to which dates she was on FMLA leave.  However, her job was still open to her until October of 2003.  Also, she has offered no evidence that any benefits were taken from her while she was on FMLA leave; as discussed in Part III of this Opinion, both the placement of Plaintiff on the one-day sick slip requirement and the denial of her right to accept leave donations occurred in late June of 2003, well after Plaintiff returned from FMLA leave.  Thus, there is no genuine issue of material fact as to whether Defendant violated the FMLA by not restoring Plaintiff's job and benefits after she returned from FMLA leave.

### B.        Judicial Estoppel

Defendant finally argues that Plaintiff is judicially estopped from bringing an action for Defendant's violation of the FMLA, because she receives SSDI benefits. (Def.'s Mem. Supp. Summ. J. 27-29.)  Specifically, Defendant contends that Plaintiff cannot simultaneously "argue[] that her rights under the FMLA were violated because it was determined that she was unable to perform the essential functions of her position with SCHD" and "concede[] that she qualifies for disability insurance benefits under the social security program, which requires that she be unable to work based on her disability."  (*Id*. at 28.)

In support of its argument, Defendant cites *Cleveland v. Policy Mgmt. Sys. Corp*., which held that "an ADA plaintiff cannot simply ignore the apparent contradiction that arises out of [an] earlier SSDI total disability claim.  Rather, she must proffer a sufficient explanation."  526 U.S. 795, 806 (1999).  In particular, the Supreme Court noted that, "[t]o survive a defendant's

motion for summary judgment, [a plaintiff] must explain why that SSDI contention is consistent with her ADA claim that she could 'perform the essential functions' of her previous job, at least with 'reasonable accommodation.'"  *Id.* at 798.  *See Fox v. General Motors Corp.*, 247 F.3d 169 (4th Cir. 2001).

Although the *Cleveland* case sets forth a clear analysis to be applied where a Plaintiff pursues SSDI and ADA claims, Defendant acknowledges that the Supreme Court's decision is narrowly tailored, and this Court was unable to find any Fourth Circuit cases applying the *Cleveland* holding to FMLA claims.  Thus, this Court does not find that Plaintiff's FMLA claim is estopped as a matter of law by her receipt of social security benefits.

For the reasons stated above, Defendant's Motion for Summary Judgment is DENIED as to Count Seven.

<u>CONCLUSION</u>

For the reasons stated above, Defendant's Motion for Summary Judgment is GRANTED as to Count Five (Md. Code Ann. Art. 49B - Race Discrimination) and Count Six (Md. Code Ann. Art. 49B - Retaliation), DENIED as to Count Four (Title VII - Retaliation) and Count Seven (FMLA Violations), DENIED in part as to Count Three (Title VII - Disparate Discipline for Denial of Educational Leave), and GRANTED in part as to Count Three (Title VII - Disparate Discipline for Missed Work and Disparate Discharge).  Accordingly, this case shall proceed to trial on Count Three (Title VII - Disparate Discipline for Denial of Educational Leave), Count Four (Title VII - Retaliation), and Count Seven (FMLA Violations).

Dated:   September 14, 2006                         /s/_____
                                                    Richard D. Bennett

United States District Judge